**KING ENTERPRISES, INC., d/b/a Stanley Steamer Carpet Cleaner, a Michigan Corporation, Richard King, individually, C.T. Leasing Company, a Michigan Corporation, Martin Chevrolet Sales, Inc., a Michigan Corporation, William Martin, individually, A.T. Frank Company, Inc, a Michigan**

Corporation, Ward Building Products, Inc., a Michigan Corporation, Self Serve Lumber Company, a Michigan Corporation, D.W.S. Inc., d/b/a Dale Stroebel's Complete Automotive Service, a Michigan Corporation, Debut Coach Company, Inc., d/b/a Debut Automotive Design, a Michigan Corporation, R & D, Inc., d/b/a Tuffy Auto Service Centers, a Michigan Corporation, Old Tyme Roadhouse, Inc., d/b/a Old Tyme Roadhouse, a Michigan Corporation, Coco Investments, L.L.C., a Limited Liability Company, Jack's Fruit Market, Inc., a Michigan Corporation, K.J. Properties, L.L.C., d/b/a Cornerstone Center, a Limited Liability Company, Craig S. Bye, Sr., individually, Redmond Automotive, Inc., a Michigan Corporation, JWP, Inc., a Michigan Corporation, Duclos Insurance Agency, Inc., a Michigan Corporation, David Duclos, and Bonnie Duclos, husband and wife, and Azimuth Investments, Inc., Plaintiffs,

v.

THOMAS TOWNSHIP, a general law Township, Defendant.

No. 01–10242–BC.

United States District Court,
E.D. Michigan,
Northern Division.

July 24, 2002.

Robert C. Miller, Shinners & Cook, Saginaw, MI, for plaintiffs.

Otto W. Brandt, Jr., Saginaw, MI, for defendant.

### OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

In 1999, the defendant, Thomas Township, enacted a comprehensive ordinance which was intended to regulate "the construction, alteration, repair, maintenance, size, location, and number of signs" that

property owners may construct or display on their land within each of five zoning districts in the Township. Thomas Township Ordinance 99–G–18 § 13–1–1 (hereinafter "Ord. § 13–1–1"). The plaintiffs, who include business owners and operators and residents of the Township, contend that the ordinance impermissibly regulates the content of the signs and constitutes a prior restraint on speech in violation of the First Amendment, and they have filed an amended complaint seeking a permanent injunction preventing enforcement of the ordinance. The parties have submitted a joint stipulation of facts, and based thereon the plaintiffs filed a motion for summary judgment. The parties presented their arguments through counsel in open court on December 17, 2001 and the matter is now ready for decision. The Court finds that although some of the sections of the ordinance are valid, many of the ordinance's provisions impermissibly regulate the content of protected speech, and also constitutes an unlawful prior restraint on expression, and is therefore repugnant to the First Amendment of the Constitution. The Court therefore will grant the plaintiffs' motion for summary judgment in part, sever the non-offending sections of the ordinance, and enjoin enforcement of the balance of the ordinance.

## I.

The sign ordinance was adopted by the Thomas Township Board in October 1999 after approximately sixteen months of study, according to Daniel Sika, the Thomas Township Community Development Director. Aff. of D. Sika ¶ 5. Motivated primarily by concerns of public safety, aesthetics and economic development, the township board and planning commission set about the task of regulating exterior signage in accordance with the enabling authority granted to them by the General Township Police Power Act, Mich. Comp.Laws § 41.181. The ordinance which resulted from their effort creates a comprehensive scheme that covers virtually every outdoor sign in the Township, see Ord. § 13–1–2(B) ("If any zone is omitted from this Chapter or if a new zone is created after the enactment of this amendatory Ordinance, no signs shall be permitted therein until this Zoning Ordinance is amended to include such zone and all permitted signs are specified therein."), and applies to "all persons, firms, partnerships, associations, and corporations owning, occupying or having control or management of any premises located within Thomas Township, Saginaw County, Michigan." Ord. § 13–1–2(C).

The ordinance defines a "sign" as

any device, structure, fixture, placard, name, identification, display or illustration using graphics, symbols or written copy which is affixed to or represented directly or indirectly upon a building, structure or piece of land and which is intended to direct attention to, advertise or identify an object, product, place, goods, services, activity, person, institution, organization or business. However, a "sign" shall not include any display of official court or public office notices nor shall it include the flag of any political unit or school. A "sign" shall not include a sign located completely within an enclosed building. A pole, frame or structure used to hold a sign, not on a building is to be considered part of that sign.

Ord. § 3–1–14. Various sections of the ordinance prescribe the size, shape, location and content of allowed signs in each of the five zoning districts and, with some specifically enumerated exceptions, require a permit to be issued "[p]rior to construction, establishment, repair, replacement or changing of message" of a sign within the Township. Ord. § 13–1–10(A).

There are also provisions allowing non-conforming signs to remain intact for up to five years after the ordinance's effective date, but certain triggering events can curtail that privilege and require immediate compliance. For instance, section 13–1–12(C) of the ordinance requires existing signs to be brought into compliance if the content of the message on the sign is changed.

Two of the plaintiffs in this case, C.T. Leasing Co. and Azimuth Investments, Inc., are business owners who displayed signage before the ordinance took effect. C.T. Leasing owned a building which included an outdoor pole sign displaying the names of the tenants who occupied the building. When one of the tenants vacated its suite and another tenant moved in, C.T. Leasing changed the panel display on the sign to reflect the name of the new tenant. C.T. Leasing did not obtain a permit for this change. The Township contended that the change in the sign's message caused a forfeiture of the sign's legal non-conforming status, and that the pole sign did not conform to the ordinance's requirements, and therefore it issued a citation to C.T. Leasing to answer charges constituting a civil infraction. Azimuth has also been cited for a violation of the ordinance under similar circumstances.

Thereafter, the plaintiffs commenced this action under 42 U.S.C. § 1983 alleging that the sign ordinance impairs freedom of expression and exceeds the Township's regulatory authority under the First and Fourteenth Amendment "by imposing a complicated array of restrictions, limitations, conditions and bans on the content and type of signs that citizens of the Township currently use or may elect to use in the future." First Am.Compl., ¶ 28. In their first amended complaint, the plaintiffs set forth nine counts contending that the sign ordinance (1) violates the First Amendment as an unconstitutional regulation of both commercial and non-commercial speech; (2) violates the First Amendment as an unconstitutional prior restraint on a protected activity; (3) violates the Fourteenth Amendment's Equal Protection Clause; (4) violates the First Amendment as unconstitutionally overbroad; (5) violates the First Amendment as unconstitutionally vague; (6) violates the Fourteenth Amendment as unreasonable regulation under substantive due process; (7) lacks a legitimate purpose under the General Township Police Power Act, Mich. Comp.Laws § 41.1(a); (8) unconstitutionally interferes with the private contractual rights; and (9) violates the Fourteenth Amendment under the Procedural Due Process Clause.

The defendant has responded that the primary purpose of the ordinance is to regulate off-premises advertising, that the ordinance is permissive in that it allows all signs and messages except those which are specifically regulated or prohibited, and that it is the intent of the township officials to administer the ordinance in a content-neutral fashion. The Township contends, therefore, that the ordinance constitutes a valid regulation of the time, place, and manner of displaying messages which does not contravene the First Amendment.

The ordinance itself has fourteen sections which state the purpose of the ordinance; define its scope; set forth regulations for signage in the different zoning districts and for specific types of signs (billboard, off-premises and temporary signs); describe prohibited signs and non-conforming signs; prescribe the permitting process and exceptions to the permitting process; establish structural and illumination requirements; outline inspection, removal, and safety procedures; and define several terms.

Section three of the ordinance addresses the basic regulation for each of the five

zoning districts: business, manufacturing, residential, environmental, and agricultural. A subsection of the ordinance purports to regulate the contents of the message on the signs in each district; the subsection, which is repeated in the description of permitted signs in each of the five districts, states, "Signs allowed in this zone shall contain information pertaining to permitted uses and applicable to a use therein." Ord. §§ 13–1–3(A)(10), (B)(4), (C)(4), (D)(4), & (E)(4).

The business district subsection contains a provision which distinguishes between "pole or ground signs" and "wall signs." A "pole sign" is "[a] sign that is free standing and supported by one or two poles which can be seen and who's [sic] advertisement begins off of grade level, and is not considered a ground sign." Ord. § 13–1–14. A "ground sign" is "[a] sign that is designed to begin advertisement or display at or near ground level, and no supporting poles are shown, and it is not considered a pole sign." *Id.* A wall sign is "[a] sign that is attached parallel to a wall on a building." *Id.* The total square feet of sign area for pole or ground signs is three-quarters the building frontage in lineal feet, not to exceed fifty square feet on any pole or ground sign. Ord. § 13–1–3(A)(2)(a). Wall signs are limited to "one (1) square feet for each lineal foot of building store frontage of primary use or uses, but the maximum for any one business shall be fifty (50) square feet." Ord. § 13–1–3(A)(2)(b). In addition,

[a]ll wall signs shall attach to the business structure and not project above the roof line. The allowed wall signage may be divided into not more than two (2) wall signs per business. Signage for parcels which lie on a corner lot shall be computed by using the building frontage which gives them the most signage.

*Id.* Display case signs are included in the total signage allowed on a parcel. Ord. § 13–1–3(A)(7).

The ordinance provides that

[i]f more then [sic] one business is located on a parcel, the percentage of total signage allowed shall be determined by calculating the building frontage for the business in question and dividing that by the total amount of building frontage of all businesses on said parcel. The percentage obtained will be the percentage of allowable signage that each business will be allowed to display on the pole or ground sign, not exceeding fifty (50) square feet total.

Ord. § 13–1–3(A)(3). Three or more businesses on a parcel are allowed to have a combined identity sign that identifies the building, plaza, or place of the businesses (not to exceed thirty-five square feet) and identify up to eight businesses with one foot by five foot signs. Ord. § 13–1–3(A)(3).

Business district parcels may have no more than two wall signs and a maximum of one pole or ground sign, unless it has more than three hundred feet of frontage; then, it may have an additional pole or ground sign and "[o]ne additional pole or ground sign may be erected for every additional one hundred fifty (150) lineal feet of frontage." Ord. § 13–1–3(A)(4)(b). Pole or ground signs may not exceed twelve feet above average grade level. Ord. § 13–1–3(A)(6)(a).

Gasoline stations and drive-thru restaurants are allowed additional signage. Gasoline stations are allowed "(a) Gasoline pump signs not exceeding three (3) feet per pump containing customary information regarding the brand and type of gasoline sold, (b) One changeable copy sign attached to protective vehicle bumper poles at the end of each row of pumps, [and] (c) Display rack signs for the orderly

display of oil, tires, beverages or other accessories or goods sold at the gasoline stations." Ord. § 13–1–3(A)(8). Drive-thru restaurants are allowed "(a) Menu sign not exceeding twenty (20) square feet in total, located along the drive thru lane, (b) One changeable copy sign not exceeding six (6) square feet in total, located within ten feet of the menu sign, [and] (c) Special direction signs not exceeding one (1) square foot in area and five (5) in total number." Ord. § 13–1–3(A)(9).

The subsection regulating the manufacturing district permits each individual establishment "one (1) identity sign per parcel with a maximum area of one (1) square foot for each lineal foot of building frontage or one-half (½) square foot for each lineal foot lot frontage, whichever is greater, up to a fifty (50) square foot maximum." Ord. § 13–1–3(B)(2). For corner lots, "[o]nly one ground or pole sign is allowed per parcel" and signage "shall be computed by using the building frontage which gives them the most signage." Ord. § 13–1–3(B)(3). Permitted signs "shall not be closer to any lot line than ten (10) feet ... [and][o]ff-premise signs shall be no closer than ten (10) feet to any lot line or right-of-way." *Id.* However,

> [t]he Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative may require any pole or ground sign to establish a minimum sight distance by use of a greater setback from a property line or right-of-way where the sign could obstruct the vision of traffic.

Ord. § 13–1–3(B)(2). Further, "[t]he height of any pole or ground sign shall not exceed a maximum of twelve (12) feet from the average grade level to the top of the sign." Ord. § 13–1–3(B)(5).

The subsection regulating residential districts allows single or two family dwellings "[o]ne sign not exceeding one and one half (1 ½) square foot in area attached to

the building or place in the yard, ... provided said sign does not advertise a business." Ord. § 13–1–3(C)(2)(a). In addition, one "home occupation" sign is permitted. *Id.* Multiple dwellings or subdivisions may mark the location of a group of homes by erecting "two ground-mounted signs totaling twenty four (24) square feet in area," not exceeding eight (8) feet in height, and "of the same size and construction." Ord. § 13–1–3(C)(2)(b). All signs in the residential district must be ten feet from the road right of way and the property line. Ord. § 13–1–3(C)(3).

The subsection regulating environmental districts allows one sign for each "permitted principal use." Ord. § 13–1–3(D)(2). The sign is limited to "one-half (½) square foot for each lineal foot of lot frontage not to exceed a maximum of thirty two (32) square feet." Ord. § 13–1–3(D)(2). Like the manufacturing district, corner lots are only allowed one pole or ground sign "computed by using the lot frontage which gives them the most signage" and all signs "shall be determined by the Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative to give clear vision on all corners and near existing or future structures to assure the safety of the public." Ord. § 13–1–3(D)(3).

Agricultural district property owners are limited to one sign "one-half (½) square foot for each lineal foot of lot frontage not to exceed a maximum of thirty two (32) square feet." Ord. § 13–1–3(E)(2). The sign "shall not exceed a maximum of twelve (12) feet from the average grade level of the top of the sign" and be "no closer to any lot line or right of way than ten (10) feet." Ord. § 13–1–3(E)(3). Like signs in the environmental district, a determination by a township representative as to clear vision is required. Ord. § 13–1–3(E)(3).

Section four of the ordinance regulates the construction, size, and placement of billboards. There is no provision in this section which touches upon the content of the billboards.

Section five of the ordinance regulates small off-premise signs, which are defined as "freestanding sign[s] advertising the location or activities of any church or non-profit service club or charitable association[. They] may be erected anywhere except for parcels zoned (R–1) or (R–2)." Ord. § 13–1–14. *See also* Ord. § 13–1–5. These signs require a sign permit, and a maximum of two small off-premise signs per church or service club may be erected and maintained within Thomas Township. Ord. § 13–1–5(6) & (7). Small off-premise signs "must be placed back-to-back with a maximum of one (1) foot in between the backs of the faces" and "signs shall be on a single post not greater than twelve (12) inches wide unless a licensed engineer documents a need from a greater width." Ord. § 5(3) & (4). The signs "may not be larger than three (3) square feet in area[,] setback ten (10) feet from any road or highway right-of-way[,] setback [ ] ten (10) feet from property line," and may not "be established within three thousand (3,000) feet of any other [ ] sign on the same side of the street or highway, [or] within one thousand (1,000) feet of any other [ ] sign on the other side of the street or highway." Ord. § 13–1–5(1) & (2) (citing Ord. § 13–1–4(D)).

Section six sets forth regulations for thirteen different "temporary signs." Construction signs "identify the architects, engineers, contractors and other individuals or firms involved with the construction" and shall not exceed a maximum area of twenty square feet per firm. Ord. § 13–1–6(A). They are allowed during the construction period, limited to two years, and "shall be removed upon the occupancy of the intended use of the project." *Id.*

"Temporary real estate directional signs" shall not exceed four in number, nor exceed three feet in height, nor exceed four square feet in area. Ord. § 13–1–16(B). They shall be "placed out of the right-of-way . . . on approach routes to an open house up to two (2) days prior to an open house [and] must be removed within one day after the open house." *Id.* "Residential district" signs are temporary real estate signs (i.e. "For Sale," "For Rent," or "For Lease"). Ord. § 13–1–6(C). One sign per road frontage is allowed; each sign in a residential zoning district shall not to exceed four square feet, while each sign in non-residential zoning districts shall not exceed ten square feet. *Id.* If the sign "list[s] two or more parcels in the same subdivision or development," it shall not exceed six square feet. *Id.* All residential district signs "must be removed within twenty (20) days after the sale of the property." *Id.*

"Political campaign" signs "announc[e] referendum issues or candidates seeking public political office and other data pertinent thereto." Ord. § 13–1–6(D). The signs are confined to private property and each premises has a limit of thirty-two square feet of signage; signs twelve square feet or larger require a temporary sign permit. *Id.* The signs may be displayed up to thirty days prior to and up to five days after the election. *Id.*

"Street banners" are "[f]abric signs, suspended across public streets advertising a public entertainment or event." Ord. § 13–1–14. The banner require approval by the Township Board and the Saginaw County Road Commission or Michigan Department of Transportation. *Id.; *Ord. § 13–1–6(E). The ordinance requires that banners "shall be determined to give clear vision on all corners and near existing structures to assure the safety of the public." *Id.* The banner may be displayed for

a period of up to fourteen days before through up to seven days after the event. *Id.*

"Seasonal business" signs are allowed "for a maximum of sixty (60) days per calendar year." Ord. § 13–1–6(F). They require written permission prior to "acquiring a temporary sign permit from the Community Development Department." *Id.* A "seasonal business" "sell items which are only available due to the growing season for a limited period of time, during which time only those items produced during the growing season can be advertised. A seasonal business is one that is only open during the Michigan growing season." Ord. § 13–1–14. These signs are limited to "[o]nly items grown on a parcel within Thomas Township." Ord. § 13–1–6(F). These signs shall not exceed thirty-two square feet or twelve feet in height. *Id.*

"Temporary Advertising Displays" includes "only the display of pennants, constructed of cloth, canvas, plastic sheet or other like materials displayed for a limited period of time" by "site plan approved businesses" and the "temporary outdoor use of a display tent for items typical [sic] found within the approved business." Ord. § 13–1–6(G). Items designated as "temporary advertising displays" are not allowed "in any part of the required front yard setback area." Ord. § 13–1–6(G)(1). These displays require a temporary sign permit and are limited to "no more than forty five (45) days per calendar year per business on said parcel.... Only one such display may take place on a single parcel at a time." Ord. § 13–1–6(G)(2). Pennant displays are allowed if

> a display pattern showing the color and design is submitted and approved upon temporary sign permit request. A sample of the pennants to be used shall be inspected to assure their condition is clean and neat upon temporary sign per-

mit request. It shall be the Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative duty to assure that the pennants are in good condition.

Ord. § 13–1–6(G)(4). However, pennants displayed by automobile sales and dealer lots are not "temporary signs" and may be displayed "in a traditional manner within the front and side yards providing it is done in a clean and safe manner. No worn or tattered pennants may be used." Ord. § 13–1–6(G)(3).

"Temporary Portable Advertising Signs" are "portable in nature and used for the advertisement of a product or event excluding specific signs addressed in the Sign Ordinance." Ord. § 13–1–14. They may not "exceed a total height of six (6) feet and a total sign area of thirty two (32) square feet" and must comply with "all other requirements of this Zoning Ordinance." Ord. § 13–1–6(H)(1). Like the "temporary advertising displays," these signs may not be displayed more than a total of forty-five days in any calendar year; however, the forty-five-day limit does not apply to "seasonal business," whose signs may be displayed for not to exceed 120 days. *Id.;* Ord. § 13–1–6(H)(2). A temporary sign permit is required, except in residential districts. Ord. § 13–1–6(H)(5). Residential districts may have "temporary portable advertising signs" for forty-eight hours "for birthdays and other events related to the household" provided they conform to the five foot setback from property lines and right-of-way. Ord. § 13–1–6(H)(5).

A subclass of "temporary portable advertising signs" are "seasonal displays." "Seasonal displays" are "[d]isplays within the Business District, Environmental District, and Industrial District, used for such events as Christmas, Easter, and others for the purpose of promoting community

spirit and good will." Ord. § 13–1–14. Although seasonal displays require a temporary sign permit, no permit fee is charged. These displays must be "determined to give clear vision on all corners and near existing structures to assure the safety of the public [and] shall not obstruct the traffic in any parking areas or cause a lack of parking in any parking location." Ord. § 13–1–6(H)(4).

"Off–Premise Temporary Signs" "shall include content strictly for the uses allowed by agricultural, residential, environmental and charitable purposes" and may be located in any district except R–1, R–2, or R–3. Ord. § 13–1–6(I). They shall not exceed five feet in height or thirty-two feet in area and shall be located at least ten feet from any front or side property line. The ordinance states that

> [t]his type of sign is allowed for a maximum of forty five (45) days per calendar year and is subject to acquiring a temporary sign permit from the Community Development Department. Written permission from the property owner is required before a temporary sign permit is issued. If an off-premise temporary sign is used on a parcel zoned (B) business or (M) manufacturing, the business located on that parcel shall have its total allowable days for the year to display a temporary sign reduced for every day the off-premise temporary sign is used on that parcel.

*Id.*

"Single purpose signs" are "intended to convey a message for a short period of time" and "may portray persons, events, locations or functions of general interest to the community." Ord. § 13–1–6(J). Commercial announcements are allowed for up to fourteen days "subject to the judgment of and approval of the Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative and issuance of a temporary sign

permit." *Id.* Noncommercial announcements "for personal and public interest" are allowed for up to three days. *Id.*

"Institutional" signs "set[ ] forth the name of any single announcement for any public, charitable, educational, or religious institution." Ord. § 13–1–6(K). These signs must be entirely within the premises of the institution, cannot exceed twenty-five square feet, and if a pole or ground sign, shall be less than twelve feet above average grade. *Id.*

Signs indicating the name of a child care center or day care center in any residential district shall not exceed five square feet, not be more than five feet above average grade, and be approved by the Township Planning Commission. Ord. § 13–1–6(L).

The ordinance regulates "signs on vehicles" under the temporary signs section. The "sign on vehicles" subsection states that

> [s]igns on vehicles of any kind are allowed provided the sign is painted or attached directly to the body of the original vehicle and does not project or extend beyond the original manufactured body of the vehicle, provided that the primary use of the vehicle is not for advertising purposes. If a vehicle is parked at a location in such a manner and for such a purpose as to constitute a use primarily intended for sign advertising purposes, then the regulations as to signs in the zoning district in which it is located shall be applied to include the sign on the vehicle and said sign shall be considered a ground sign. Any vehicle used specifically for business purposes with the name of the business or products painted or attached directly to the body of the vehicle must be parked beyond the front yard setback, and any applicable street side yard setback or, with written approval of the Zoning Ad-

ministrator, Building Inspector, Code Enforcement Officer or his or her authorized representative, may be parked in an area determined by the Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative as a parking area for said vehicle. If the vehicle can be parked in an area which meets the requirements of the Ordinance, the Zoning Administrator, Building Inspector, Code Enforcement Officer or his or her authorized representative shall not give written approval to park outside of said area. Ord. § 13–1–6(M).

Section seven of the ordinance lists seven categories of signs which do not require a permit. These signs must, however, "comply with all other requirements set forth in this ordinance." Ord. § 13–1–7. They include "public signs" ("erected by or on the order of a public officer" and are of a "governmental" or "noncommercial" nature "in the public interest," such as "safety signs, danger signs, trespassing signs, traffic signs, memorial plaques, signs of historical interest," Ord. § 13–1–7(A)); "integral" signs ("names of buildings, date of erection, monumental citations, commemorative tablets and the like when carved into stone, concrete or similar material or made of bronze, aluminum or other permanent type construction and made an integral part of the structure," Ord. § 13–1–7(B)); "private traffic direction signs," ("[s]igns directing traffic movement or giving instructions, located within a parcel," Ord. § 13–1–14); "small signs" ("not exceeding two (2) square feet in area, stationary and not illuminated, announcing the name and occupation of building," Ord. § 13–1–7(D)); "temporary land development" signs ("pertaining to the sale, lease, rent, or development of a subdivision, planned shopping center, industrial park, or similar land parcel," Ord. § 13–1–7(E)); "farm" signs (stating the "[n]ames of occupants and other identification painted or otherwise made a part of the surface or roof of a barn or other accessory building pertaining to and identifying the owner and/or activity of the farm unit provided said identification is not for advertising purposes," Ord. § 13–1–7(F)); and "property address" signs (which are placed "on the front of the home or business if located at or near the minimum front yard setback" or "on a mailbox or in an area that can be seen clearly from the roadway" where a greater setback is used, Ord. § 13–1–7(G)).

The eighth section of the ordinance lists categories of prohibited signs. Included are signs with "obscene content," (i.e., "[c]ontain statements, words, or pictures of an obscene or indecent character, such as will cause a potential traffic hazard by distracting drivers," Ord. § 13–1–8(B)(1)); "imitation traffic signs," (which "[c]ontain or are in imitation of an official traffic sign or signal, or contain the words 'stop', 'go slow', 'caution', 'danger', 'warning', or similar words," Ord. § 13–1–8(B)(2)); signs which "resembl[e] or interfer[e] with traffic-control devices," Ord. § 13–1–8(B)(3); "abandoned business or product" signs (which "[a]dvertise an activity, business, product or service no longer conducted on the premises upon which the sign is located," Ord. § 13–1–8(B)(4)); signs that "hide any traffic or street sign or signal from view" or are "placed within any clear vision area or obstruct the view of pedestrian traffic in any direction," Ord. § 8(B)(6); signs located "in the right of way of any public street unless it is approved by the body with jurisdiction over said street, roadway or highway," Ord. § 13–1–8(B)(7); and signs with "moving parts." This subsection states that signs

[m]ust not move in any manner or have moving parts. Only minor decorative parts may move. No sign shall consist of a[sic] banners, posters, ribbons,

streamers, strings of light bulbs, spinners, or other similar moving devices. These devices are prohibited, unless they are permitted specifically by other legislation in this ordinance. Ord. § 13–1–8(B)(5). The subsection recognizes one exception: "Auto sale dealerships, new or used may use customary displays of ribbons or pennants if kept in like new condition and not determined to distract drivers to cause a traffic hazard. In no case shall such display take place over any landscaping or green areas." *Id.*

Section nine of the ordinance regulates the structural requirements and standards for signs and deals with durability, compliance with electrical and building codes, appearance and painting.

The tenth section addresses sign permits. Sign permits are required "[p]rior to construction, establishment, repair, replacement or changing or message." Ord. § 13–1–10(A). Once a sign permit is issued for a pole or ground sign, "all pole or ground signs on the parcel must be brought into compliance with all provisions of this ordinance." *Id.* Thus, a "parcel shall no longer be considered legal nonconforming" when a sign permit is issued, when a sign is erected without obtaining a sign permit if required, or a repair is ordered by a township official. Ord. § 13–1–10(A)(1)–(3) sign permit application must include a "set of plans for any sign that is to be installed, changed, replaced or repaired." Ord. § 13–1–10(B). The plans shall be in scale of at least ¼ inch to 1 foot; "show [ ] the front profile of the sign from grade to the top of the sign" including a lighting diagram and

> a plot plan ... of the sign in relation to property lines, right-of-way lines, parking spaces, and building, as well as any existing signs on the parcel including billboards. All sign sizes shall be indicated on the plot plan as well as each businesses building frontage. A picture

of the existing building or wall signage as well as a picture of any existing pole or ground signage must be provided with the application. Ord. § 13–1–10(B)(1)–(3). The sign permit fee is established by the Board and is doubled if a permit is not obtained prior to construction, set-up, or erection of the sign. Ord. § 13–1–10(D). Permanent sign permits expire if work on the sign is not completed within six months of the date of issuance. Ord. § 13–1–10(E)

Certain signs are exempt from the sign permit requirements. These include "replacing copy" signs, which are "approved theater marquee, gas station pricing board or similar approved signs which are specifically designed for the use of replaceable copy"; "cleaning and other normal maintenance [to signs,] such as painting and light bulb replacement"; signs listed under the "exemptions" section; and "commemoration signs," signs less than three feet by three feet which "use donations to support recreation and athletics and use these funds to construct items such as ball fields, back stops, outfield fences, bleachers and other related items" and only display "the name of the business and location." Ord. § 13–1–10(F)(1)–(4).

The eleventh section regulates illumination of signs. All illuminated signs must comply with the National Electrical Code as amended by Thomas Township. Ord. § 13–1–11(A). Illuminated signs must be "shaded, shielded or directed [so] the light intensity or brightness will not be objectionable to surrounding areas." Ord. § 13–1–11(B). "[B]linking, flashing or fluttering lights"; illumination devises that "chang[e] light intensity, brightness or color"; and "moving patterns of light so as to convey an illusion of motion or animation" are prohibited. Ord. § 13–1–11(C). The ordinance states that "[n]o colored lights shall be used at any location or in any

manner so as to be confused with or construed as traffic-control devices. Only seasonal displays can use colored lights, but only after a temporary sign permit for such a display is issued by the Zoning Department." Ord. § 13–1–11(D).

The ordinance allows "electronic message boards" in zoning district B–1, B–2, B–3, B–4 and M–1. Ord. § 13–1–11(G). The message may not change more than every twenty seconds and "all lights in a display shall activate simultaneously, remain activated for not less than twenty (20) seconds and deactivate simultaneously." *Id.* No moving patterns of light are allowed and electronic message boards are not allowed on parcels with "nonconforming, currently existing" signs. *Id.* Two subsections later, the ordinance provides that "[s]igns which electronically display only the time and temperature are exempt from the above, provided the frequency of message change is not less than five (5) seconds." Ord. § 13–1–11(I).

The twelfth section of the ordinance addresses nonconformities. It states that all signs that do not conform to the ordinance as of its effective date shall be listed as such in the township records, but may continue to exist "provided there is no change to the sign's structure, facade, location, size, lighting, message, or content, excluding normal maintenance such as painting the sign without changing any aspect listed including changing font or font size." Ord. § 13–1–12(B). When a change is made to the nonconforming sign, all signs on the parcel must be brought into compliance at that time, or by October 4, 2004, whichever is earlier. Ord. § 13–1–12(C) & (D).

The thirteenth section of the ordinance regulates the "inspection, removal, [and] safety" of signs. Signs may be inspected periodically "to assure the sign is kept in good repair and attractive condition, and to assure the safety of the public and for compliance with this and other Codes of the Township." Ord. § 13–1–13(A). To aid in inspection, "[a]ll signs requiring permits shall display in a place conspicuous to inspectors the name, address and phone number of the owner .... in an area where the Inspector can see clearly using no ladder or similar device." Ord. § 13–1–13(B).

Signs shall be kept "in good repair and sound structural condition," which includes keeping them neatly painted and replacing non-functioning lights. Ord. § 13–1–13(C). Signs must be repaired or brought into compliance within ten days of notice from the township or may be removed by a township official at the owner's expense. Ord. § 13–1–13(C) & (D). The notice "shall be made in writing, delivered personally to the parcel or by certified mail [and] shall be served to the owner or manager of the building, structure or occupant of the building or parcel on which such sign is located". Ord. § 13–1–13(D). When a sign is removed, an invoice is sent to the owner of record of the parcel where the sign is located. *Id.* If an invoice is not paid within sixty days, the cost is added to the subsequent year's property taxes. *Id.*

Signs which are "prohibited" or "present a clear and existing danger to public safety" must be removed within twenty-four hours after notice is given. Ord. § 13–1–13(E) & (F). Because of the "urgency of the such situations, written contact is not required before a [dangerous] sign is so removed." Ord. § 13–1–13(F). Abandoned signs shall be removed by the owner or will be removed by the township after ten days notice is given. Ord. § 13–1–13(G). Violations pertaining to "temporary" and "temporary advertising display" signs must be corrected within forty-eight hours after receiving written notice by certified letter or a ticket can be issued. Ord. § 13–1–13(H).

The ordinance provides that "[w]hen a parcel of land is subject to two (2) types of zoning districts sharing the same road frontage, the total allowable signage for the property is determined by using the district which would allow the *least* amount of signage." Ord. § 13–1–13(1) (emphasis added).

## II.

■ Although the defendant has not contested the plaintiffs' standing to challenge the constitutionality of the sign ordinance on its face, it is important to observe that prudential standing rules are somewhat relaxed in the First Amendment context. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir.1999). Normally, a party bringing a lawsuit must show an actual or threatened injury resulting from the alleged illegal action and may only assert a violation of its own rights. *Virginia v. American Booksellers Assoc., Inc.*, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). However, the freedom of expression and the unfettered exchange of ideas is considered the lifeblood which sustains a democracy. *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (stating that "[t]he protection given speech and press was fashioned to· assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"). Thus, where a law regulates speech based on content, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), contains a prior restraint of protected speech, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), chills the right of expression of third parties, *American Booksellers*, 484 U.S. at 392, 108 S.Ct. 636, or restricts the expression of others not be-

fore the court, *Members of the City Council for the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), third parties may wage a facial challenge to the offending law based on First Amendment rights. *American Booksellers*, 484 U.S. at 392–93, 108 S.Ct. 636.

■ In this case, two of the named plaintiffs have been cited for civil infractions stemming from a change in the content of the message on their respective signs. The defendant has not contested other allegations in the amended complaint that the named plaintiffs are residents and business owners who rely upon signs to communicate informational messages, both commercial and noncommercial, to other businesses and to the general public. *See* Am.Compl. ¶¶ 32 & 33.

The text of the ordinance in several instances prescribes the allowable content of the messages on signs within the various zoning districts. Further, the sign ordinance is pervasive and regulates virtually all signs to be displayed on land within the Township, requiring a permit in most instances issued by a public official who is not governed by any discernable standards contained within the ordinance. The permitting process is engaged whenever there is a proposed change in the *message* of the sign, even if no structural or aesthetic changes are also made, and permits are required before a message may be displayed.

The plaintiffs in this case have standing to challenge the constitutionality of the sign ordinance because it is content based, *R.A.V.*, 505 U.S. at 381, 112 S.Ct. 2538, and because it delegates licensing discretion to a public official who is not constrained by any provision of the ordinance to assure that it is administered in a content-neutral fashion. *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)

("[I]t is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.")

### III.

The plaintiffs have filed their motion for summary judgment pursuant to Fed. R.Civ.P. 56. A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions, or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

A party may support a motion for summary judgment by demonstrating that an opposite party, after sufficient opportunity for discovery, is unable to meet her burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may not merely rely upon the pleadings to oppose a motion for summary judgment but must come forward with affirmative evidence in the form of materials described in Rule 56(c) to establish a genuine issue on a material fact. *Id.* at 324, 106 S.Ct. 2548. Even in complex cases, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–81 (6th Cir.1989).

■ The defendant in this case contends that an adequate factual record has not yet been developed to establish the manner in which township officials intend to administer the sign ordinance. However, the defendant may not oppose a summary judgment motion on the basis of immaterial facts. *Boyd*, 215 F.3d at 599. The contest to the ordinance leveled by the plaintiffs is a facial challenge. When First Amendment rights are implicated, the relevant scope of inquiry is focused on the text of the law, not the facts surrounding its application. *See, e.g., Belle Maer Harbor v. Harrison Township*, 170 F.3d 553, 556–57 (6th Cir.1999). Thus, irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of material fact. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric.*

*Implement Workers of Am. v. BVR Liqui-dating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999).

### A.

The plaintiffs contend that the sign ordinance violates their rights under the First Amendment because it contains "pervasive" content-based restrictions on protected non-commercial speech and protected commercial speech. The plaintiffs rely heavily on *North Olmsted Chamber of Commerce v. City of North Olmsted,* 86 F.Supp.2d 755 (N.D.Ohio 2000), in which the court enjoined the enforcement of a local sign ordinance. The *North Olmsted* Court found that the sections of the ordinance which classify signs by their use type were content-based and the sections that classify signs by their structural type were content-neutral. The court held that the content-based restrictions on non-commercial speech were unconstitutional because "the City has not shown that the content-based distinctions are necessary to serve their interests of safety and aesthetics, and because the ordinance is not narrowly drawn by the least restrictive means to achieve those interests." *Id.* at 769. As to content-based commercial speech, the court held that the City "provided no evidence that would support the contention that the content-based restrictions in [these sections] directly and materially contribute to safety and aesthetics." *Id.* at 771. In the end, the court struck down the entire ordinance, finding the ordinance a "thicket of content-based distinctions [and] an impermissible system of prior restraint." *Id.* at 779.

The defendant here argues that *North Olmsted* is distinguishable because (1) the ordinances are significantly different, (2) the *North Olmsted* Court had a more developed factual record because of a prior referral to a magistrate judge, and (3) the plaintiffs "misinterpret significant provisions" of the ordinance to "ratchet the provisions ... into the type of ordinance invalidated in *North Olmsted.*" The defendant argues that the township had the authority to enact the sign ordinance, emphasizes that nonconforming signs may remain unchanged for five years, and contends that the ordinance is a valid "time, place, and manner" restriction.

■ The First Amendment states that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend I. The First Amendment is applicable to the states and their political subdivisions via the Fourteenth Amendment's Due Process Clause. *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 489 n. 1, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Lovell v. City of Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

■ The first determination a court must make when evaluating a law that governs speech is whether the regulation is content-neutral or content-based, inasmuch as this determination prescribes the level of scrutiny that is used is assessing the constitutionality of the law. *Richland Bookmart, Inc. v. Nichols,* 137 F.3d 435, 440 (6th Cir.1998). A regulation is content-neutral if it can be "justified without reference to the content of the regulated speech," even if regulation has an incidental effect on some but not all speakers or messages. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). A law which controls the substance of a speaker's message is not content-neutral, even if it has broad application. *Hill v. Colorado,* 530 U.S. 703, 767, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (finding that protesting, educating, or counseling on any subject within eight feet of any health care facility is content-based because it does not apply to all buildings in

the state). *See also Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.").

1.

■ Certain sections of the sign ordinance regulate the structure, appearance and placement of signs without regard to content. These sections include the provisions dealing with billboards, Ord. § 13–1–4; the section prescribing structural requirements and standards, Ord. § 13–1–9; and regulations dealing with illumination, except the section relating to time and temperature displays, Ord. § 13–1–11, but not subsection (I). If the regulation is content-neutral, it may permissibly impose reasonable time, place, and manner restrictions. *Cleveland Area Bd. of Realtors v. City of Euclid,* 88 F.3d 382, 386 (6th Cir.1996); *Wheeler v. Comm'r of Highways, Commw. of Ky.,* 822 F.2d 586, 589 (6th Cir.1987). The restrictions are valid if they (1) "are narrowly tailored to serve a substantial government interest" and (2) "leave open ample alternative channels for communication of the information." *Cleveland Area Bd. of Realtors,* 88 F.3d at 385. Under the "time, place, and manner" analysis, a "narrowly tailored" ordinance "does not have to have eliminated all less restrictive alternatives," but "must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 388 (internal quotes omitted).

■ Section 13–1–4 regulates the size, height, location, and illumination of billboard signs; content is not regulated. The ordinance requires the billboard signs to be 300 feet from the road or any residence and 3000 feet from any billboard on the same side of the street and 1000 feet

from any billboard on the opposite side of the street; not exceed 200 square feet in area or 30 feet in height; be a minimum of 12 feet from the lowest point of the sign's supporting structure; and, if illuminated, "prevent beams or rays of light from being directed onto adjoining residential structures or at any portion of the traveled ways." These regulations all further the government's stated purposes (promoting traffic safety, protecting public and private investment and property values, preventing light obstruction, and limiting the adverse impact caused by proliferation of billboards).

Section 13–1–9 regulates the structural standards for all signs. This section includes visual regulations:

> All signs shall be constructed to withstand all normal weather conditions for this area. Where the back is visible, it must be suitably painted or otherwise covered to present a neat and clean appearance.

Ord. § 13–1–9(A)(1). The regulations in this section further the government's interest in public safety. See Ord. § 13–1–1. Section 13–1–11, like section 13–1–9 regulating the structural standards, furthers the government's interest in public safety by regulating the illumination of all signs.

The last element of the "time, place, and manner" analysis is whether there are alternative channels for communication. This inquiry is only relevant to the section regulating billboards (§ 13–1–4). Because the ordinance does not prohibit billboards and allows other signs, the ordinance does not foreclose alternative channels of communications.

The Court concludes that, if the ordinance is severable, sections 4, 9, and 11 (except (I)) are valid "time, place, and manner" restrictions.

### 2.

■ Other sections of the ordinance must be viewed differently. The regulations allowing signs in the various zoning districts (Ord. § 13–1–3) are based on content; the signs must include "information pertaining to permitted uses and applicable to a use therein." The section regulating small off-premises signs (Ord. § 13–1–5) applies only to signs "advertising the location or activities of any church or non-profit service club or charitable association." The classification of temporary signs (Ord. § 13–1–6) is based entirely on the purpose and import of their message. Exceptions to the permit requirements (Ord. § 13–1–7) are likewise allowed entirely based on the content of the signs described in this section of the ordinance. Content determines whether certain signs are altogether prohibited from display within the Township. *See* Ord. § 13–1–8. Electronic message boards for time and temperature (Ord. § 13–1–11(I)) are the only electronic message boards which may change as often as every five seconds. Finally, a permit is required in most instances when a message on a sign is changed, Ord. § 13–1–10(A), and permit exemptions may be allowed for "commemoration signs," which are defined as signs acknowledging donors to "[s]chools or parks which use donations to support recreation and athletics and use these funds to construct items such as ball fields, back stops, outfield fences, bleachers and other related items." Ord. § 13–1–10(F)(4).

All of these regulations are content-based.

If the restrictions on expression are content-based, then the Court must determine whether the restrictions involve commercial or non-commercial speech. Commercial speech has been defined as "expression related solely to the economic interests of the speaker and its audience" or "speech proposing a commercial trans-

action." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 493, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995).

#### a.

■ Content-based restrictions on non-commercial speech are analyzed under the "strict scrutiny" test. *Boos v. Barry*, 485 U.S. 312, 321–22, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Under that test, the Township must "show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Id.* (internal quotes omitted). Although "safety" and "aesthetics" are substantial government interests, they are not compelling enough to justify content-based restriction on fully-protected, noncommercial speech. *North Olmsted Chamber of Commerce v. City of North Olmsted*, 86 F.Supp.2d 755, 767 (2000); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08, 514–15, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

■ Several provisions of the sign ordinance reach speech that is not "proposing a commercial transaction." For instance, the regulations prescribing signs allowed in the zoning districts (Ord. § 13–1–3) limits the content of the signs to "information pertaining to permitted uses and applicable to a use therein." The defendant argues that these provisions are not at all limiting but are permissive and only purport to regulate off-premises advertising. The defendant contends that the provisions are not exclusive, but rather state what must be included for the sign to qualify under the ordinance. In other words, the defendant says, once the sign contains information pertaining to a permitted use, the sign may, in addition, contain any other message.

The Court cannot accept the gloss on the text of the ordinance urged by the defendant. If it were true that any message on signs were permitted once the

"qualifying language" first appeared, then even the ordinance's professed purpose would be overrun, as other messages might well include advertising. Further, it is well understood that legislative texts which list activities that are allowed, such as the text of the subsections of Section 13-1-3—"Signs allowed in this zone shall contain information pertaining to permitted uses . . . ."—necessarily exclude activity, or in this case, other messages, that are *not* allowed. *See Olden v. LaFarge Corp.*, 203 F.R.D. 254, 264 (E.D.Mich.2001) (citing *Equal Employment Opportunity Comm'n v. Kimberly–Clark Corp.*, 511 F.2d 1352, 1362 (6th Cir.1975)). Once that principle is recognized, it is clear that this ordinance contains language that would authorize a government official to restrict or prohibit protected speech. Thus, signs in residential districts may not contain messages which relate other than to residential uses; signs in environmental districts must relate to environmental uses; manufacturing signs to manufacturing uses, and so forth. There are obviously other subjects on which residents may want to express an opinion in the form of written messages other than those limited to residential uses. The same holds true for other use zones. However, the Township has not offered sufficient justification under the strict scrutiny test for the authority to curtail protected, noncommercial speech, and therefore Section 13-1-3 of the ordinance is unconstitutional.

■ The section regulating small off-premises signs (Ord. § 13-1-5) is limited in its application to those signs which "advertis[e] the location or activities of any church or nonprofit service club or charitable association." There is no other provision in the ordinance which allows small, off-premises signs which display other messages. This section therefore contains two forms of content-based restrictions: it allows only churches, service clubs and charities to post small, off-premises signs;

and it confines the messages of those organizations to announcing their location and activities. The Township has not explained how the limitation of content of these messages advances their stated goals. For instance, safety and aesthetics are promoted no more by allowing a sign which states only location or activities than by a sign which announces a tenet of faith, or a proverb, or the motto or mission of a service club. Nor has it been established that limiting the display of such messages to churches, charities and service clubs will serve a government interest.

■ The privilege of maintaining nonconforming signs also depends on not altering the "message, or content" of the sign itself. Ord. § 13-1-12(B). The justification for allowing a content-based triggering event has not been established by the Township.

■ Allowance of temporary signs depends on the messages they contain. *See* Ord. § 13-1-6. Many of the allowed signs described in this section state noncommercial messages, such as information at construction sites, street banners announcing public activities and political campaign signs. Signs which display messages other than those enumerated in this section of the ordinance are not allowed under this section. Thus, a political message exhorting citizens to contact their representative concerning pending legislation would not be allowed, but a sign advocating the election of a candidate displayed with thirty days of an election is permitted.

■ Likewise, exceptions to the permit requirements (Ord. § 13-1-7) are based on the types of signs (public signs, integral signs, private traffic direction signs, small signs, temporary land development signs, farm signs, and property address signs) which are categorized according to content. Similarly, the ordinance section on

prohibited signs (Ord. § 13–1–8) identifies them by content. There is even a list of prohibited words ("stop," "go slow," "caution," "danger," "warning," *see* Ord. § 13–1–8(B)(2)) that may not be contained in signs. Thus, an octagonally-shaped sign stating "Stop Illegal Drugs" would be prohibited. Signs with ribbons or streamers are not allowed, except for automobile dealers. Electronic message boards for time and temperature (Ord. § 13–1–11(G)) are the only electronic message boards which may change as often as every five seconds. Finally, the permit exemptions found in Ord. § 13–1–10(F) allows "commemoration signs," which are defined as a sign no larger than three feet by three feet by "[s]chools or parks which use donations to support recreation and athletics and use these funds to construct items such as ball fields, back stops, outfield fences, bleachers and other related items." Ord. § 13–1–10(F)(4). All of these regulations are content based and must be given strict scrutiny.

Although the foregoing sections of the ordinance promote the goals of aesthetics and safety to the extent that they prohibit or eliminate some signage, they also allow other signs which may very well compromise those goals. The distinction between what is allowed and what is prohibited is based on the content of the message or the identity of the person or institution displaying the sign. The ordinance, then, allows the Township to regulate which messages are displayed, and by whom, and which are prohibited. However, "[w]ith respect to noncommercial speech, the [Township] may not choose the appropriate subjects for public discourse." *Metromedia*, 453 U.S. at 515, 101 S.Ct. 2882. Nor are the regulations narrowly tailored to achieve the Township's goals. "This lack of narrow tailoring, along with the myriad exceptions the [Township] provides to favored speakers, significantly undercuts the [Township]'s rationales of safety

and aesthetics." *North Olmsted,* 86 F.Supp.2d at 768.

The Court concludes, therefore, that the sections of the ordinance referenced above impermissibly regulate noncommercial speech and are unconstitutional.

b.

 Content-based restrictions of commercial speech are analyzed under the four-part test announced by the Supreme Court in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Under *Central Hudson,* the Court must determine whether (1) the speech is protected by the First Amendment, (2) the government interest is "substantial," (3) the regulation "directly advances the governmental interest asserted," and (4) the regulation is no more extensive than necessary to serve the governmental interest. *Id.* at 566, 100 S.Ct. 2343. The defendant admits for the purposes of this motion that the plaintiffs' sign messages are protected by the First Amendment. Def.'s Br. in Opp'n to Pls.' Mot. for Summ.J. at 11. Similarly, the Supreme Court has held that "safety" and "aesthetics" are substantial governmental interests that can justify the regulation of some commercial speech. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507–08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

"The last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). Thus, the third part of the test requires an examination of the regulation to determine whether it actually and directly addresses the perceived harm or otherwise advances the governmental in-

terest. "[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane,* 507 U.S. 761, 770–771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The Supreme Court has "observed that 'this requirement is critical; otherwise, "a State could with ease restrict commercial speech in the service of other objectives. that could not themselves justify a burden on commercial expression."'" *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (quoting *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)).

The test's fourth part limits the scope of the third. The Supreme Court explained:

The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it. The Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."

*Greater New Orleans,* 527 U.S. at 188, 119 S.Ct. 1923 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).

■ The only section of the ordinance which regulates purely commercial speech is found at Ord. § 13–1–6, covering temporary signs described as Construction signs, Temporary Real Estate Directional signs, Seasonal Business signs, Temporary Advertising Display signs, Temporary Porta-ble Advertising signs, and Child Care signs. The ordinance regulates the time period for the signs due to the temporary nature of the advertising, although there is no time limit on the display of child care signs. The temporary advertising display and temporary portable advertising signs each have a 45–day limit per parcel of land per year. Seasonal businesses may display signage for sixty days during the year. The sixty-day period is not specified as continuous, and the sign may advertise for sale "[o]nly items grown on a parcel within Thomas Township." Ord. § 13–1–6(F). Off premises advertising signs are allowed except in residential zones, but they may only include "content strictly for the uses allowed by agricultural, residential, environmental, and charitable purposes." Ord. § 13–1–6(I). Ord. § 13–1–6(H)(4) provides that "[d]isplays related to Christmas and Easter may be allowed for forty-five (45) days" within the business, environmental and industrial districts.

This section of the ordinance also contains restrictions on size and placement of certain signs in order to "give clear vision on all comers and near existing structures," or to be "clean and in good condition and designed to assure the safety of the public." However, it is not clear how the restriction based on content uniformly advance the goals of safety and aesthetics. For instance, it is difficult to conceive of a justification that allows a produce seller to advertise products grown in Thomas Township but not those grown elsewhere. Allowing certain temporary signage for forty-five days per year while not allowing businesses to use this potentially effective form of speech during the remaining 10½ months of the year is not a regulation "whose scope is in proportion to the interest served." Nor can the other content-based restrictions in this section of the ordinance be justified effective and narrowly tailored to achieve the goals of safe-

ty and aesthetics. The Court concludes, therefore, that the restrictions on commercial speech are unconstitutional.

3.

 The plaintiffs also contend that the ordinance constitutes an unlawful prior restraint on speech. "A 'prior restraint' exists when speech is conditioned upon the prior approval of public officials." *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 889 (6th Cir.2000). Although prior restraints "come to the court bearing a heavy presumption against their validity," they are not unconstitutional *per se*. *Id.*

 A licensing scheme that requires advance authorization to display a protected message may not be content-based. *See Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (citing *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). Although the ordinance section outlining the requirements for and issuance of permits does not specifically condition the issuance of permits on the nature of the message sought to be displayed, the ordinance section does require engaging the process whenever there is a proposed "changing of [the] message" on a sign. Ord. § 13–1–10(A). Requiring official permission to change a sign's message is disturbingly suggestive of authority to sanction the message itself. The ordinance contains no language to assuage that concern, which leads to another fatal defect in this section.

The Supreme Court has described "two evils that will not be tolerated" in licensing schemes that require prior governmental permission to display or express a protected message. *FW/PBS, Inc.*, 493 U.S. at 225, 110 S.Ct. 596.

> First, a scheme that places "unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."
> [Citations omitted.] " 'It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.' " *Shuttlesworth [v. City of Birmingham]*, 394 U.S. [147,] 151, 89 S.Ct. 935, 22 L.Ed.2d 162 [(1969)] (quoting *Staub [v. City of Baxley]*, 355 U.S. [313,] 322, 78 S.Ct. 277, 2 L.Ed.2d 302 [(1958)] ). Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible.

*Id.* at 225–26, 110 S.Ct. 596.

In this case, the permit section of the ordinance contains no restrictions on or standards governing the authority of the issuing official. The Supreme Court's First Amendment jurisprudence requires prior-permission licensing laws relating to speech to contain "narrow, objective, and definite standards to guide the licensing authority." *Forsyth*, 505 U.S. at 131, 112 S.Ct. 2395. This ordinance contains no restrictions at all. It grants the local government official unbridled discretion to decide whether a sign contains an acceptable message, which of several categories into which the nature of the message or identity of the speaker falls, and whether the nature of the communication will be allowed under the specific, content-based ordinance provisions for each of the five zones. The power to deny the permit is thus equivalent to the power to deny the message which, of course, constitutes unconstitutional government censorship.

In addition, there are no procedural safeguards attendant to the permit pro-

cess. The Sixth Circuit has held that a licensing system which relates to speech must contain at least two features: "(1) the decision whether to issue a license must be made within a specified brief period, and the status quo must be maintained during that period and during judicial review, and (2) there must be a 'guarantee of prompt judicial review.'" *Nightclubs*, 202 F.3d at 890 (citing *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 225 (6th Cir.1995)).

In *Nightclubs*, the city enacted an ordinance to license and regulate sexually oriented businesses and their employees. The ordinance required submissions by the businesses and inspections by the city. The ordinance provided that "[t]he City shall approve or deny the issuance of a license to an applicant within ten (10) business days after receipt of a completed sexually oriented business application." *Nightclubs*, 202 F.3d at 887. The Court held that

> [a]lthough the ordinance states that Paducah will approve or deny an application within ten days, the ordinance also states that no license will issue unless the City executes, and the premises passes, a variety of building inspections. *See* Ord. § 11–7(a). No specific time limits for completion of these inspections are placed on the "appropriate City departments and agencies." *Id.* Further, the ordinance does not indicate that a license shall issue if any of the City departments fails to complete a mandatory inspection within a timely period.

*Id.* at 890.

The ordinance in this case contains neither of these "safeguards." The ordinance "fails to provide for the prompt issuance of a license," and in that respect is even more egregious than the ordinance in *Nightclubs:* although the ordinance contains many specific time periods for correcting violations and construction of signs after a permit is issued, it does not indicate a time period for the Building Inspector to grant or deny an application for a sign permit. In addition, neither the ordinance nor the variance procedures provide for "prompt judicial review."

The conclusion is unavoidable, therefore, that the permit section of the ordinance constitutes an unconstitutional prior restraint of protected speech and may not be enforced.

4.

■ The ordinance contains a provision that it is "severable," such that if "any provision ... [is] declared invalid or unconstitutional ..., such decision shall only affect the particular provision ... and shall not affect or invalidate the remainder." Ord. § 13–1–16. The Court has found that certain sections of the ordinance do not violate the First Amendment, specifically sections 13–1–4, 13–1–9, and 13–1–11 (except (I)). The Court must therefore determine whether these portions are severable, which "is a question of state law." *City of Lakewood*, 486 U.S. at 772, 108 S.Ct. 2138.

The Michigan Supreme Court has states that the general rule of statutory construction "favors severability." *Blank v. Dep't of Corr.* 462 Mich. 103, 122–23, 611 N.W.2d 530, 539 (2000). *See* Mich.Comp.Laws § 8.5. Thus, if a non-offending portion of a statute is independent of an unconstitutional provision, and is "otherwise complete in itself and capable of being carried out without reference to the unconstitutional" section, the non-offending portion may stand. *Maki v. City of East Tawas*, 385 Mich. 151, 159, 188 N.W.2d 593, 596 (1971).

In this case, the non-offending sections of the ordinance deal with the placement and construction of billboards, non-content-based structural requirements, and lighting. Absent the prior permit require-

ment, these sections are nonetheless enforceable through inspection, compliance demands and judicial violation proceedings. They are, in effect, extensions of the local building code that prescribe the physical requirements for all signs regardless of content, and they may be announced to those seeking to erect signage and enforced after-the-fact. These sections constitute independent provisions capable of enforcement apart from the remainder of the ordinance. The Court concludes, therefore, that sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) of the ordinance are severable and do not violate the First Amendment.

### B.

The plaintiffs have raised other grounds attacking the validity of the sign ordinance. Because the Court concludes that all but the severable portions are unconstitutional, the Court will address the plaintiffs' remaining arguments only with respect to the severed sections.

### 1.

■ The plaintiffs have alleged that the ordinance violates state law because the Township exceeded its authority in enacting it. Michigan law authorizes townships to "adopt ordinances regulating the public health, safety, and general welfare of persons and property." Mich. Comp.Laws § 41.181. Townships are permitted to enact ordinances to regulate a "broad range of activities." *Graham v. Kochville Township*, 236 Mich.App. 141, 146, 599 N.W.2d 793, 797 (1999). Regulatory ordinances are permissible if they are "reasonable and not confiscatory." *Casco Township v. E. Brame Trucking Co.*, 34 Mich.App. 466, 471, 191 N.W.2d 506, 508 (1971). Unlike zoning ordinances, however, they are "not encumbered by a nonconforming use provision." *Id.* In other words, because regulatory ordinances are "blind to zoning differences," a regulatory ordinance is not subject to the require-

ment of accommodating nonconforming uses. *City of Grandville v. Strobridge*, 127 Mich.App. 705, 711, 339 N.W.2d 531, 534 (1983). Because the ordinance was enacted for the "health, safety, and welfare" and in fact has a period which permits nonconforming signs to remain, the ordinance was properly enacted under the township's general police power.

Because no genuine issue of material fact exists and the plaintiff has failed to submit evidence to support this claim, the Court denies relief to the plaintiffs concerning the severed sections of the ordinance on count seven of the amended complaint.

### 2.

■ The plaintiffs also challenge the ordinance as an unlawful impairment of contractual obligations. The Michigan Constitution states that no "law impairing the obligation of contract shall be enacted." Mich. Const. art. I, § 10. This prohibition, however, is not absolute. *Romein v. Gen. Motors Corp.*, 436 Mich. 515, 534, 462 N.W.2d 555, 565 (1990). An accommodation is made for the use of the inherent police power "to safeguard the vital interest of its people." *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)). In determining whether accommodation is appropriate, the Court must determine whether the law has (1) operated as a substantial impairment of a contractual relationship, (2) has a legitimate public purpose, and (3) has a reasonable means by which contracting parties' rights and responsibilities are adjusted. *Id.* at 534–36, 462 N.W.2d at 565–66, 462 N.W.2d 555.

Although the plaintiff alleges that "[i]t is common in commercial leases to negotiate and contract signage rights" and that the ordinance "attempts to usurp any private contract in this regard," the plaintiffs have

failed to set forth any facts proving substantial impairment. The severed sections ordinance do not forbid all signs and merely prescribe the manner in which signs may be constructed, illuminated and maintained. In addition, existing nonconforming signs may remain unchanged until October 4, 2004; leases which are renewed between now and that date can be negotiated with the parties having knowledge of the provisions of the ordinance.

The legitimate public purpose prong of the test requires a valid exercise of the police power. *Romein,* 436 Mich. at 535, 462 N.W.2d at 565. As determined above, the enactment of the sign ordinance was a valid exercise of the Township's police power.

The last prong requires the Court to examine the means of adjustment of the rights and responsibilities of the parties. The "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Romein,* 436 Mich. at 536, 462 N.W.2d at 566 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22–23, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). In the instant case, the ordinance permits signs which fail to comply to remain nonconforming until October 4, 2004, five years after the ordinance was passed.

Because no genuine issue of material fact exists and the plaintiff has failed to submit evidence to support this claim, summary judgment will be denied on count eight of the complaint with respect to the severed sections of the ordinance.

### 3.

The plaintiffs also argue that the sign ordinance is void for vagueness. The thrust of this argument is directed toward sections of the ordinance already invalidated. Under the First Amendment, "speakers are protected from arbitrary and discriminatory enforcement of vague standards." *Nat'l Endowment for the*

*Arts v. Finley,* 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998). "The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1051, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

These risks are not present in sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) of the ordinance. They contain reasonably clear and concise requirements for the physical aspects of signs to be displayed in the Township. Count five of the amended complaint therefore provides no basis for relief as to these sections of the ordinance.

### 4.

Count four of the amended complaint alleges that the ordinance is invalid because it is overbroad. Once again, this argument is directed to those portions of the ordinance which could apply to noncommercial, protected speech. The concept of overbreadth does not apply to commercial speech. *Staley v. Jones,* 239 F.3d 769, 786 n. 22 (6th Cir.2001) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496–97, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). For non-commercial speech, the Court looks to "whether the regulation reaches a substantial amount of constitutionally protected speech." *Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1182 (6th Cir.1995).

The sections of the ordinance governing the physical features of signs do not offend these principles, and the plaintiffs are therefore not entitled to relief on count four of the amended complaint as to in sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) of the ordinance.

### 5.

In counts six and nine of the amended complaint, the plaintiffs argue

that the ordinance is invalid because of a violation of both the substantive and procedural aspects of the Due Process Clause. In analyzing a procedural due process claim, the Court must first determine whether a liberty or property interest exists. The Court then decides whether the procedures attendant to that interest were constitutionally sufficient. *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 259 (6th Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 459, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

■ An underlying property or liberty right must be a "legitimate claim of entitlement." *Richardson v. Township of Brady*, 218 F.3d 508, 516–17 (6th Cir.2000). Entitlement is not "[a]n abstract need or unilateral expectation." *Id.* A "subjective expectation is irrelevant when determining whether one is entitled to procedural due process protection." *Furlong v. Shalala*, 156 F.3d 384, 395 (2d Cir.1998). Freedom of speech guaranteed under the First Amendment is a liberty interest protected under the Fourteenth Amendment due process clause. *Bauer v. Montgomery*, 215 F.3d 656, 661 (6th Cir.2000).

■ Although the plaintiffs have a liberty interest in presenting their messages, they still must prove a constitutional deprivation their liberty interest. *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir.2001). Procedural due process involves the right to notice and the opportunity to be heard. *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The legislative process provides protection for procedural due process rights, even if a law of general applicability affects certain individuals more than others. *Rogin v. Bensalem Township*, 616 F.2d 680, 693 (3rd Cir. 1980).

General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule . . . . There must be a limit to individual argument in such matters if government is to go on.

*Id.* (quoting *Bi–Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915)).

Moreover, in this case, the sections of the ordinance which govern the physical aspects of signage can be judicially enforced, with all the procedural rights in the state courts that are available to putative offenders.

The Court believes that nothing in sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) of the ordinance offends the notions of fundamental fairness ensconced in the concepts of procedural and substantive due process.

### VI.

The Court finds that sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) of the ordinance are constitutional and severable from the remaining portions of the ordinance. The balance of the ordinance is inextricable intertwined, and, as noted above, violates the First Amendment. It may not be enforced.

Accordingly, it is **ORDERED** that the plaintiffs' motion for summary judgment [dkt # 13] is **GRANTED IN PART.**

It is further **ORDERED** that the defendant is enjoined from enforcing Thomas Township Ordinance 99–G–18, except for sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) thereof.

It is further **ORDERED** that counts three through nine of the plaintiffs' amended complaint are **DISMISSED.**

## JUDGMENT

In accordance with the Opinion and Order Granting In Part Plaintiffs' Motion for Summary Judgment entered on this date,

It is **ORDERED AND ADJUDGED** that judgment is entered for the plaintiffs and against the defendant.

It is further **ORDERED, ADJUDGED AND DECLARED** that the Thomas Township Ordinance 99–G–18 § 13–1–1, *et seq.*, except sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) thereof, is declared unconstitutional as violative of the First Amendment to the Constitution of the United States.

It is further **ORDERED AND ADJUDGED** that defendant, its respective officers, agents servants, employees, attorneys, and those persons in active concern or participation with it who receive actual notice of this judgment by personal service or otherwise, are hereby **ENJOINED AND RESTRAINED** from enforcing or requiring compliance with Ordinance 99–G–18 § 13–1–1, *et seq.*, except sections 13–1–4, 13–1–9, and 13–1–11 (except (I)) thereof.

It is further **ORDERED AND ADJUDGED** that counts three through nine of the plaintiffs' amended complaint are **DISMISSED.**