**Alexander N. SMITH, by his parents Kenneth W. SMITH and Janet S. Smith, Plaintiffs,**

v.

**MOUNT PLEASANT PUBLIC SCHOOLS, Defendant.**

No. 01–10312–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Sept. 30, 2003.

Richard J. Landau, Bradley L. Smith, Dykema Gossett, Ann Arbor, MI, Kary L. Moss, Michael J. Steinberg, American Civil Liberties Union Fund of Michigan, Detroit, MI, Thomas C. Bromell Mt. Pleasant, MI, for Plaintiffs.

Daniel S. Opperman, William J. Ewald, Braun, Kendrick, Saginaw, MI, for Defendant.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiff, Alexander Smith, who during the relevant times in this case was a student attending a public high school in Mt. Pleasant, Michigan, has filed an action through his parents under 42 U.S.C. § 1983, alleging that his civil rights were violated when administrators employed by the defendant school district suspended him for conduct deemed a "verbal assault" under a district policy implemented pursuant to a state statute, Mich. Comp. Laws § 380.1311a(2). He seeks a declaration that his conduct was protected by the First Amendment, and that the state statute and district policy are unconstitutional,

and prays for an injunction against further enforcement and an order deleting the disciplinary measures against him from his school record. The parties filed cross motions for summary judgment, and the Court heard the arguments of counsel in open court on October 24, 2002. Thereafter, the Court notified the Michigan Attorney General that the constitutionality of the state statute was being challenged, and invited the attorney general to respond, pursuant to 28 U.S.C. § 2403. No response has been received and the matter is now ready for decision.

The Court finds that the defendant's so-called "verbal assault" policy, and the enabling statute upon which it is based, are unconstitutionally vague and overbroad. However, the Court also finds that the defendant could properly discipline the plaintiff for his insulting remarks directed at school personnel, and that the discipline did not violate the plaintiff's First Amendment rights. The Court, therefore, will grant the plaintiff's motion in part and enjoin further enforcement of the policy as presently drafted, but will deny the request to change the plaintiff's school records.

## I.

On October 26, 2000, the plaintiff, Alexander N. Smith, then a junior at Mount Pleasant High School, and approximately five other friends were eating lunch in the high school cafeteria. The cafeteria was arranged with tables seating 8 to 10 students in a tight configuration. While eating lunch, one of the plaintiff's friends requested that the plaintiff read aloud a three-page, typewritten commentary criticizing the high school's tardy policy. The plaintiff read aloud the commentary to about seven other people sitting at the lunch table. The commentary was also overheard by at least two other female students. Prior to the reading at the cafe-

teria, James Bellanca, a hall monitor at the high school, also read the commentary.

The commentary stated that the tardy policy was made by a Nazi, and gave the names of some teachers who the plaintiff believed supported the policy, referring to these teachers as "teacher gestapos [*sic* ]." The plaintiff devised a crude abbreviation for the tardy policy, calling it "turd. lic.," which he also designated as "turd licking." Aside from criticizing the tardy policy, the commentary discussed the belief that the high school principal, Betty Kirby, had divorced her husband after having an affair with another school principal whom she later married. Mrs. Kirby was referred to as a "skank" and "tramp" to whom people did not want to talk because "no one likes to think about two school principals having sex." The commentary also stated that Assistant Principal Michael Travis was confused about his sexuality. *See* Pl.'s Mot. S.J., Ex. A.

At some point after the commentary was read aloud by the plaintiff, a female student confronted Mr. Travis and told Mr. Travis that she overheard the plaintiff's commentary in the cafeteria and was greatly offended by the plaintiff's words. Mr. Travis also met with another female student who also expressed that she was offended by the plaintiff's comments regarding Mt. Pleasant High School personnel.

Around 1:00 p.m. on October 26, 2000, the school's liaison police officer asked the plaintiff to leave his physics class and escorted him to a conference room in the school. Mr. Travis and Mrs. Kirby questioned the plaintiff regarding the commentary that the plaintiff had read aloud. After Smith stated that the commentary remained in his backpack, Mrs. Kirby asked that it be brought to the conference room. Mrs. Kirby then read the commentary to herself, and afterwards the

plaintiff apologized to Mrs. Kirby. On October 27, 2000, Mrs. Kirby informed Smith's parents by telephone that the plaintiff was being charged with "verbal assault" under the school's student code of conduct. A letter mailed by Mrs. Kirby to the parents that same day informed the parents that the plaintiff would be suspended for ten school days.

The Mt. Pleasant Student Code of Conduct defines verbal assault as follows:

> Assault: Intimidation of students or staff; the act of verbally, physically, sexually or otherwise threatening the well-being, health, safety, or dignity of persons on school property or going to and from school, including any school activity under Board sponsorship. MINIMUM SUSPENSION OF TEN (10) DAYS. REFERRAL TO THE SUPERINTENDENT/BOARD OF EDUCATION, AND/OR LEGAL AUTHORITIES.
>
> .    .    .    .    .
>
> *The [School] Board shall ... expel a student in grade six or above for up to 180 school days if the student commits a physical assault at school against another student, commits verbal assault against a District employee, volunteer, or contractor or makes a bomb threat directed at a school building, property, or a school-related activity.*

Pl.'s Mot. S.J., Ex. F at 2–3 (certain emphasis in original omitted).

The Code of Conduct also contains an "Elastic Clause," which states that high school personnel "reserve[ ] the right to discipline students for infractions not specifically addressed in this handbook ... in order to protect the general well being of the students and staff and to address a wide variety of circumstances." *Id.* at 7.

On October 31, 2000, the plaintiff delivered five apology letters addressed to school personnel mentioned in the commentary. That same day, the plaintiff, his parents, and their attorney met with several school officials. The plaintiff appealed the suspension to the principal, who upheld the ten-day suspension. The plaintiff then appealed the suspension to the superintendent of schools, who offered to reduce the suspension to eight days if the plaintiff voluntarily submitted to psychological screening at Mt. Pleasant Counseling Services.

The plaintiff underwent the psychological screening at Mt. Pleasant Counseling Services. After speaking with the plaintiff and reading the commentary, the counselor opined that the commentary was not intended for delivery, publication, or harm. Furthermore, the counselor noted that based on the assessment, the plaintiff did not suffer from any pathology or psychological disorder. *See* Pl's Mot. S. J., Ex. D. After the evaluation, the superintendent reduced the plaintiff's suspension to eight days.

The plaintiff and his parents appealed the superintendent's decision to the Mt. Pleasant Board of Education, which upheld the superintendent's decision to suspend the plaintiff for eight days. The plaintiff completed the suspension and returned to school in January 2001. The plaintiff graduated from Mt. Pleasant High School in June 2002.

The plaintiff filed this lawsuit on September 5, 2001. The complaint contains four counts. The first two counts seek relief, via Section 1983, on the basis of the First and Fourteenth Amendments, respectively, and counts three and four are based on the Michigan constitution's free speech and due process provisions. The plaintiff prays for the following relief: (1) an order declaring the verbal assault policy unconstitutional; (2) an order declaring the enabling statute unconstitutional; (3) a declaration that the plaintiff's comments constituted protected speech and therefore did not amount to a proper basis for disci-

pline under the Constitution; (4) an order enjoining the defendant from taking any further discipline against the plaintiff for his commentary and preventing the defendant from maintaining any record of the incident; (5) an injunction preventing the school district from enforcing a policy prohibiting "verbal assault" or any other policy based on Mich. Comp. Laws § 380.1311a(2); and (6) costs and attorneys' fees. The parties filed their cross motions for summary judgment, as noted above, together with supporting affidavits and other documents, including Smith's "commentary" that was deem offensive and warranting of discipline.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The parties have filed cross motions for summary judgment, and neither suggests that there are facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003). Thus, when this Court evaluates cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506–07 (6th Cir.2003).

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir.2000).

■ The plaintiff argues that, among other things, the "verbal assault" policy and the enabling state statute are unconstitutional on their face because they are repugnant to the First Amendment. In a facial challenge to a law on First Amendment grounds, "the relevant scope of inquiry is focused on the text of the law, not the facts surrounding its application." *King Enterprises, Inc. v. Thomas Twp.,* 215 F.Supp.2d 891, 907 (E.D.Mich.2002) (citing *Belle Maer Harbor v. Harrison Twp.,* 170 F.3d 553, 556–57 (6th Cir.1999)). There is no factual dispute as to the text or content of the legislation here. The unadorned facts in this case present only issues of law for the Court to decide.

■ The plaintiff contends that the Michigan constitution provides greater rights than its federal counterpart. This argument is not supported by Michigan law. *See Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 202, 378 N.W.2d 337, 343 (1985) (commenting that rights to free speech and association under the Michigan Constitution are conterminous with those under the First Amendment); *Roy v. Rau Tavern, Inc.,* 167 Mich.App. 664, 667, 423 N.W.2d 54, 56 (1988) (stating that the "Michigan Constitution secures the same right of equal protection and due process as does the United States Constitution"). Federal courts in this Circuit have come to the same conclusion. *See Lucas v. Mon-*

roe *Cnty.*, 203 F.3d 964, 972 n. 4 (6th Cir.2000); *Mahaffey ex rel. Mahaffey v. Aldrich*, 236 F.Supp.2d 779, 783 n. 2 (E.D.Mich.2002). This Court, therefore, need not discuss the plaintiff's state constitutional claims separate from the analysis under federal law.

### A.

The plaintiff argues that the defendant's "verbal assault" policy and the state statute authorizing the school board to enact it are both vague and overbroad. The defendant's policy is set forth above. The statute states:

> If a pupil enrolled in grade 6 or above commits a verbal assault, as defined by school board policy, at school against a person employed by or engaged as a volunteer or contractor by the school board and the verbal assault is reported to the school board, school district superintendent, or building principal by the victim or, if the victim is unable to report the verbal assault, by another person on the victim's behalf, then the school board shall suspend or expel the pupil from the school district for a period of time as determined in the discretion of the school board or its designee.

Mich. Comp. Laws. § 380.1311a(2).

■ A law "is unconstitutionally overbroad when there exists 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.'" *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 361 (6th Cir.1998) (quoting *Leonardson v. City of East Lansing*, 896 F.2d 190, 195 (6th Cir.1990)); *see Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County, Tenn.*, 274 F.3d 377, 387 (6th Cir.2001) ("A law is overbroad under the First Amendment if it 'reaches a substantial number of impermis-

sible applications' relative to the law's legitimate sweep.") (quoting *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). The overbreadth doctrine exists "to prevent the chilling of future protected expression." *Staley v. Jones*, 239 F.3d 769, 779 (6th Cir.2001). *See Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). "Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down." *Deja Vu*, 274 F.3d at 387.

■ The overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). However, it is also "intentionally broad in scope." *Staley*, 239 F.3d at 779. "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Thus, "[i]n order for a statute to be found unconstitutional on its face on overbreadth grounds, 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.'" *Leonardson*, 896 F.2d at 195 (quoting *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)); *see Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6th Cir.1994).

■ The void-for-vagueness doctrine finds its roots in the Due Process Clause, as well as the First Amendment. "Under the First Amendment, 'speakers are pro-

tected from arbitrary and discriminatory enforcement of vague standards.'" *King Enterprises,* 215 F.Supp.2d at 917 (quoting *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998)). Due process requires that this Court hold a statute, ordinance, or resolution void for vagueness "if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food,* 163 F.3d at 358–59. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Not only do "[v]ague laws ... trap the innocent by not providing fair warning," but laws that fail to provide explicit standards guiding their enforcement "impermissibly delegate[ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09, 92 S.Ct. 2294; *Leonardson,* 896 F.2d at 196. "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food,* 163 F.3d at 359; *Leonardson,* 896 F.2d at 198. In the context of the First Amendment's protection of speech, the mischief that can be caused by vague statutes and rules is well-known:

> Quite simply, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). We will not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights; rather, the vague-

ness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

*United Food,* 163 F.3d at 359.

The statute and policy at issue here must be evaluated to determine whether they can be read to prohibit protected speech, and whether they contain sufficient standards to allow application and enforcement in a uniform, nonarbitrary manner without leaving undue discretion in the enforcing official to decide if certain speech violates their provisions.

1.

Ever since the Supreme Court decided *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the notion that students do not "shed their constitutional rights to freedom of expression at the schoolhouse gate" is beyond debate. Likewise, the right of school administrators to prohibit conduct that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," or that "would substantially interfere with the work of the school or impinge upon the rights of other students," *Id.* at 509, is clearly established. The Supreme Court has stated that the First Amendment rights of students in school are not as broad as those of adults expressing themselves in public. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (noting that "[i]t does not follow ... that simply because the use on an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a

public school."). In *Fraser,* the Court held that a school may prohibit lewd or vulgar, viewpoint-neutral language when such language undermines the school's basic educational mission. Moreover, when student speech is made in a manner as to appear to be school-sponsored, a school has greater authority to regulate speech that might otherwise be protected. *See Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (holding that schools may prohibit school speech in school-sponsored activities because educators have a legitimate interest in assuring that participants in the sponsored activity learn whatever lessons the activity is designed to teach). However, speech that does not fall within the more permissive limitations of *Fraser* or *Hazelwood* may not be restricted unless it is disruptive or interferes with other students' rights.

In *Saxe v. State College Area School District,* 240 F.3d 200 (3d Cir.2001), the court of appeals held that a school district's anti-harassment policy was unconstitutionally overbroad because it prohibited both protected and unprotected speech. The court succinctly summarized a school district's rights and limitations in restricting student speech under the First Amendment:

> Under *Fraser,* a school may categorically prohibit lewd, vulgar or profane language. Under *Hazelwood,* a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern. Speech falling outside of these categories is subject to *Tinker's* general rule: it may be regulated only if it would substantially disrupt school operations or interfere with the right of others.

*Id.* at 214.

The question presented by the plaintiff's overbreadth challenge in this case is whether Michigan's "verbal assault" statute and the defendant's corresponding policy can be read to prohibit speech by students that is neither vulgar or profane, nor school-sponsored, nor disruptive or compromising of the rights of other students or teachers.

█ The statute in this case requires school boards to "suspend or expel" pupils who commit "verbal assaults." The legislation delegates to individual school boards the task of defining "verbal assault." The term itself is somewhat paradoxical, inasmuch as words alone have not been sufficient to constitute an assault at common law. *See, e.g., People v. Gardner,* 402 Mich. 460, 477–79, 265 N.W.2d 1, 6–7 (1978) (collecting cases). An assault traditionally has been defined as " 'an attempt to commit a battery or an *unlawful act* which places another in reasonable apprehension of receiving an immediate battery.' " *Id.* (quoting Perkins on Criminal Law (2d ed.), at 117) (emphasis added). Another common definition is "any attempt or offer with force or violence to do a corporal hurt to another, whether from malice or wantonness, with such circumstances as denote at the time an intention to do it, coupled with a present ability to carry such intention into effect." *Id.* (quoting *People v. Carlson,* 160 Mich. 426, 125 N.W. 361 (1910)). An assault, then, generally requires an act beyond the spoken word.

By using the word "verbal" to modify "assault," the state legislature apparently intended to broaden the concept to include speech. When left to its devices, the Mt. Pleasant school board crafted a policy that mandates substantial punishment for students who "verbally ... threaten[ ] the well-being ... or dignity of persons on school property." It is not difficult to discern a laudable purpose for this legislation and the related policy, which were

enacted in the wake of highly publicized episodes of violent and tragic assaults at schools in other states. The policy can be seen to address speech that is confrontational, bullying, disruptive, and prone to instigate a violent response. However, the policy's language also would allow curtailment of speech that questions the wisdom or judgment of school administrators and their policies, or challenges the viewpoints of students in strong or even insulting terms. For instance, student commentary questioning the competence of a teacher, or advocating that a school district employee should be fired, or criticizing a fellow student as morally bereft, or complaining that a coach gives more playing time to an inferior athlete because of personal favoritism, all can be found to threaten the dignity or well-being of the targets of the criticism, who undoubtedly would take offense at the comments. As the Third Circuit noted, however, "[t]he Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe,* 240 F.3d at 215 (collecting cases).

Although use of the term "assault" might have limited the scope of the statute and school policy to prohibiting conduct that is unprotected by the First Amendment, adding the term "verbal" to the phrase suggests a wider application. The Court must determine whether a narrower construction might avoid a finding of unconstitutionality. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 4, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The defendant has not suggested any limiting construction here. Moreover, to construe the statute and policy in a limiting way would require substantial amendment. "It is well recognized that federal courts do not rewrite statutes to create constitutionality." *Vittitow v. City of Upper Arlington,* 43 F.3d 1100,

1106 (6th Cir.1995) (internal quotes omitted); quoting *Eubanks v. Wilkinson,* 937 F.2d 1118, 1122 (6th Cir.1991). *See also Dambrot v. Central Michigan University,* 55 F.3d 1177, 1183 (6th Cir.1995).

The statute and the school district's corresponding policy can both be read to prohibit viewpoint-based speech that might "threaten" someone's "well-being" or "dignity." However, it is well established that viewpoint discrimination is "an egregious form of content discrimination" and that "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). *See also W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 61, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (Brennan, J., dissenting) ("Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not.").

Neither the statute nor the policy purport to limit their reach to school-sponsored speech, speech that is vulgar or profane, or speech that would substantially disrupt school operations or abridge the rights of other students or teachers. Rather, the Court finds that this legislation prohibits speech that is protected by the First Amendment, and is therefore repugnant to it.

### 2.

■ The statute and school policy also suffer from the infirmity of vagueness. "Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and over-zealous enforcement." *Dambrot,* 55 F.3d at 1183–84. The statute does not define "verbal assault," and although it mandates a penalty for anyone committing one, the statute explicitly delegates to the school boards the responsibility of defining the terminology. The Mt. Pleasant school board's attempt at a definition fails to provide any guidance for determining what constitutes a threat to a person's "well-being" or "dignity." Those terms, in turn, invite a subjective interpretation that is unlikely to be uniform in all circumstances. Indeed, the danger of arbitrary enforcement is manifest when a thin-skinned administrator who, perhaps, herself is the target of a student's insult, is called upon to decide whether the speech constitutes a "threat" to "well-being ... or dignity." The statute provides no guidance to those who must define "verbal assault." Predictably, the school regulation itself lacks clear standards and vests virtually "unbridled discretion" in the administrators charged with its application and enforcement.

### B.

■ The determination that the statute and the school verbal assault policy are unconstitutionally vague and overbroad does not necessarily resolve the question of whether the defendant properly could suspend Alexander Smith. In its student code of conduct, the defendant reserved to

its high school administrators broad discretion in regulating the behavior of its students in "a wide variety of circumstances." As made clear earlier, however, punishment may not be meted out for a student's activity that is protected by the First Amendment, whose contours are defined in the school context by *Tinker, Fraser,* and *Hazelwood,* and their progeny. The Court believes, however, that Smith's statements concerning the marital infidelity and sexual identity of certain, named school administrators fell beyond the protection of the First Amendment.

The defendant does not contend that Smith's commentary constituted school-sponsored speech within the meaning of *Hazelwood.* In addition, although the statement was read in the cafeteria to a gathering of students who presumably were required by law to be in school that day, no serious argument is made that the listeners remained part of a captive audience, as in *Fraser.* Those decisions are not irrelevant to the analysis, but they do not overshadow the governing requirements articulated in *Tinker* that limit the regulation of protected speech.

Nonetheless, when vulgar or plainly offensive speech is involved, the Sixth Circuit does not limit the power of school officials to impose discipline to cases of expression in school-sponsored assemblies or in the classroom. *See Boroff v. Van Wert City Bd. of Educ.,* 220 F.3d 465 (6th Cir.2000) (holding that a school could ban the wearing of Marilyn Manson t-shirts because a school district need not tolerate student speech that is inconsistent with its basic educational mission). The court in *Boroff* held that "the standard for reviewing the suppression of vulgar or plainly offensive speech is governed by *Fraser."* *Id.* at 469.

The statement written and read aloud by Smith contains the expression of a

viewpoint on school governance, and more. Smith clearly objected to the school's new tardy policy, and much of his diatribe was devoted to his immature criticism of the new rule. But Smith's remarks about those charged with formulating and enforcing the policy migrated away from political speech that plainly is protected by the First Amendment, and degenerated into a salacious commentary on the private lives of his superiors. The statements did not constitute political discourse, but rather undercut the authority of administrators by generating rumors about their personal lives. The statements were not politically illuminating, but rather vicious and personal.

Nonetheless, this speech, to the extent that it related to a political viewpoint, could not be suppressed or serve as a cause for discipline, according to *Tinker*, unless it substantially interfered with appropriate discipline, or was disruptive of the school's operation, or "impinge[d] on the rights of other students." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733. *See Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 540 (6th Cir.2001) (holding that a ban on wearing clothing displaying the Confederate flag, which the plaintiffs wore ostensibly to express their "southern heritage," must be analyzed under the rules set forth in *Tinker* as to when public schools may regulate speech). *See also Melton v. Young*, 465 F.2d 1332 (6th Cir.1972) (upholding a ban on the same symbol based on *Tinker's* rationale upon on a finding that the display of that flag could cause disruption and racial unrest in a newly-integrated high school). The Court finds that Smith's statements were disruptive and interfered with discipline. Although he professes that he intended nothing more than humor, Smith clearly attempted to undermine the moral authority of the principal and assistant principal by questioning Mrs. Kirby's marital fidelity and Mr. Travis' sexuality. Spreading such

gossip, and calling the school principal a "skank" and a "tramp," invited discipline, and would have rendered ineffective a school administrator who would not respond to such a display of disrespect. Moreover, Smith's conduct (reading aloud a letter about school policy and personnel in a school cafeteria) "substantially interfered with the work of the school" and caused a disruption. At least two students, one of whom was demonstrably upset, complained to the school's vice-principal that they felt uncomfortable after hearing the plaintiff's commentary. One student said that she tried without success to avoid listening to it because the personal comments denigrating high school administrators offended her. Imposing discipline for such commentary is consistent with the limitations stated by the Supreme Court in *Tinker*.

Smith's comments referring to the sexual activity of school administrators also constitute lewd and vulgar speech, which falls into the category of sanctionable expression under *Fraser*. As the Supreme Court noted, "surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the fundamental values necessary to the maintenance of a democratic political system disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions." *Fraser*, 478 U.S. at 683, 106 S.Ct. 3159. Of course, if the punishment was given as a means of suppressing the plaintiff's viewpoint on a matter, a different case would be presented. *See Boroff*, 220 F.3d at 473 (Gilman, J., dissenting) (stating that, "[c]onsistent with the Supreme Court's First Amendment jurisprudence, taking sides in that manner would be considered viewpoint discrimination,

which is accompanied by an all-but-irrebuttable presumption of unconstitutionality."). But there is no evidence that the discipline given the plaintiff was imposed in retaliation for his views on the tardy policy. Rather, the suspension appears to be a punishment for personally insulting the principal and vice-principal, and spreading rumors about their personal and private matters.

Perhaps the severity of the punishment in this case represents an overreaction by Mrs. Kirby to Smith's puerile insults. However, the severity of the sanction is generally a matter beyond the authority of the Court to address. As the Sixth Circuit noted in a case decided under the *Hazelwood* standard, "[i]t may well be that a more relaxed or more self-assured administration would have let the incident pass . . ., and perhaps that is what this administration ought to have done; it is not for us to say. Such a question, we believe, represents a judgment call best left to the locally elected school board, not to a distant, life-tenured judiciary." *Poling v. Murphy*, 872 F.2d 757, 761 (6th Cir.1989).

The Court finds that the defendant could punish Alexander Smith for his publicly-read comments that displayed disrespect and contempt for the administrators charged with the duty to form and educate the public school students in the Mt. Pleasant public school district. The act of imposing discipline under the circumstances of this case does not offend the First Amendment.

### III.

The Court finds that the state statute requiring school boards to suspend or expel students for committing "verbal assaults," and authorizing school boards to enact rules defining that term, is unconstitutionally vague and overbroad. Likewise, the provision in the defendant's code of conduct purporting to define "assault" to include certain offensive language is vague and overbroad. Neither of these provisions is enforceable because they violate the First Amendment to the Constitution. However, the defendant did not act in an unconstitutional manner in disciplining the plaintiff in this case.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt # 12] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the defendant's motion for summary judgment [dkt # 21] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the defendant, it servants, agents and employees, and those in active concert and participation with it, are **RESTRAINED AND ENJOINED** from enforcing or imposing discipline on students, administrators or employees for committing "verbal assaults," as that term is presently defined by the defendant it its student codes of conduct, and from enforcing any policy or rule enacted under the authority of Mich. Comp. Laws § 380.1311a(2).

It is further **ORDERED** that the plaintiff's requests for a declaration that his comments constituted protected speech and therefore did not amount to a proper basis for discipline under the Constitution, and an order enjoining the defendant from taking any further discipline against the plaintiff for his commentary and preventing the defendant from maintaining a record of the incident, are **DENIED,** and that portion of the complaint seeking such relief is **DISMISSED WITH PREJUDICE.**